**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARTER P. and SARAH REESE** | : | **CIVIL ACTION** |
| **(HUSBAND AND WIFE),** | : | |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | **NO. 14-5715** |
| | : | |
| **POOK & POOK, LLC., RON POOK,** | : | |
| **DEBRA POOK, JAMES POOK, JAY** | : | |
| **LOWE, CONNIE & JAY LOWE** | : | |
| **ANTIQUES, MIKE CAFFARELLA,** | : | |
| **JAMIE SHEARER, MAINE** | : | |
| **ANTIQUE DIGEST, S. CLAYTON** | : | |
| **PENNINGTON,** | : | |
| **KATE PENNINGTON, and LITA** | : | |
| **SOLIS-COHEN** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

STENGEL, J.                                                           January 27, 2016

**I.      INTRODUCTION**

Presently pending are multiple Motions by the named Defendants in this Lanham

Act and antitrust action to dismiss the Amended Complaint ("AC") of Plaintiffs Carter P.

("Reese") and Sarah Reese (collectively the "Reeses").[1]  For the reasons that follow, I

grant the pending Motions, save for several common law claims against Defendants Jay

Lowe[2] and Mike Caffarella.

---

[1] Because there are multiple Motions, Responses, and Replies, I will refer and cite to
them by their ECF docket number.

[2] Plaintiffs name as defendants Jay Lowe and Connie and Jay Lowe Antiques.  I refer to
them collectively as "Lowe."

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Following the Supreme Court decisions in Bell At. Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), pleadings standards in federal actions have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009); see also Phillips v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008).  Therefore, when presented with a motion to dismiss for failure to state a claim, district courts conduct a two-part analysis.  First, the factual and legal elements of a claim are separated.  The court must accept all of the complaint's well-pleaded facts as true but may disregard legal conclusions.  Iqbal, 556 U.S. at 679.  Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  Id.  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.  Id.; see also Phillips, 515 F.3d at 234-235.  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the

Court held in <u>Twombly</u>, the pleading standard Rule 8 announces does not require
"detailed factual allegations," but it demands more than an unadorned, the-defendant-
unlawfully-harmed-me accusation. <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S.
at 555). A pleading that offers "labels and conclusions" or "a formulaic recitation of the
elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555. Nor does a
complaint suffice if it tenders "naked assertion[s]" devoid of "further factual
enhancement." <u>Id.</u> at 557.

A motion to dismiss pursuant to Rule 12 (b)(1) for "lack of jurisdiction over the
subject matter" is governed by a different standard. Because the motion goes to our
jurisdiction, i.e., the very power to hear the case, there is substantial authority that the
court is free to weigh the evidence and satisfy itself as to the existence of its power to
hear the case. <u>Mortensen v. First Fed. Sav. and Loan Ass'n</u>, 549 F.2d 884, 891 (3d
Cir.1977). There is no presumptive truthfulness attached to plaintiff's allegations, the
existence of disputed material facts will not preclude the trial court from evaluating for
itself the merits of jurisdictional claims, the plaintiff has the burden of proof that
jurisdiction does in fact exist. <u>Id.</u>

## III.    FACTUAL ALLEGATIONS

The Reeses are collectors of antique toys. (AC ¶ 4.) On October 2, 2012, they
filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the
Eastern District of Pennsylvania. (<u>Id.</u> ¶¶ 44-45.) As part of the bankruptcy proceeding,
the Reeses were required to sell a portion of their toy collection. (<u>Id.</u> ¶ 46.) Defendant
Pook & Pook, LLC ("P&P") was approved by the Bankruptcy Court as the auctioneer to

sell the collection.  (Id. ¶ 47.)  P&P and the Bankruptcy Estate of Carter Reese and Sarah Reese entered into an agreement for the sale of the toys.  (ECF 26 Ex. B.[3])  The agreement was approved by the Bankruptcy Court.  (Id. Ex. C.)  Defendants Ron Pook, Debra Pook, and James Pook (collective "the individual Pook Defendants") are principals of P&P.  (AC ¶¶ 20-22.)  None of the individual Pook Defendants were parties to the agreement.  There is no allegation in the AC that the Reeses obtained permission from the Bankruptcy Court to file the pending claims against P&P.

The Reeses allege that Carter Reese and Ron Pook agreed that the toy collection would be sold in several different sales, owing to the great volume being offered (AC ¶ 49), and Carter would be involved in the sale preparations to identify objects and review pre-sale estimates.  (AC ¶ 51.)  They allege that this did not happen and, despite their disapproval, P&P retained Defendants "Caffarella and, thus, Lowe," as experts to assist the auction sale.  (AC ¶ 53-54.)  Although the auction resulted in proceeds of approximately $560,000, the Reeses assert that the toys should have "fetched a far greater amount."  (Id. ¶ 80.)  They contend that the poor result was caused by the improper presentation of the toys at the auction.  They assert that the staging of the sale was deliberately flawed to diminish the value of the toys:  toys were presented in piles with no effort to match parts into complete toys, parts of various two- and three-part toys were

---

[3] Although it is not attached as an exhibit to the AC, the Reeses reference the agreement in the AC and do not dispute that Ex. B is the actual agreement.  Accordingly, I consider it as part of the pleadings in deciding the pending Motions to dismiss.  See W. Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 97 n. 6 (3d Cir. 2010) (stating that, as a general rule, the court may not consider on a motion to dismiss matters extraneous to the pleadings, but an exception exists for documents "integral to or explicitly relied upon in the complaint").

not matched, allowing, for example, the front end of one horse-drawn toy to go in one box lot with the back end placed in a different lot.  (Id. ¶¶ 56-60.)  As a result, on-line and phone bidders had no opportunity to identify boxes of mismatched objects and could not know the contents of any lot or where various parts could be found.  (Id. ¶¶ 61-62.) They allege that this benefited Lowe, who knew where the mismatched parts were located in the different lots, and that he bid accordingly for the items he wanted, won them at depressed prices, reassembled them, and placed them for resale at significant markup at his own business.  (Id. ¶¶ 63-75.)  The Reeses allege that Lowe had previously disparaged their collection at the James Julia Auctions in Maine, where he worked on commission basis gathering collections for auction, then bought dozens of lots to resell. (Id. ¶¶ 83-85.)  Plaintiffs also assert that the P&P catalogue of the Reese sale prominently promoted fake antiques called "newtiques," created by Lowe using original parts from antique toys and placing them on new toys, further disparaging the quality of toys in the Reese collection.  (Id. ¶¶ 87-109.)  They also allege that, after the auction, P&P sent an employee, Jamie Shearer, to the Reninger Antique Mall to criticize the collection as "junk."  (Id. ¶¶ 115-117.)

Lita Solis-Cohen is the senior editor of the Maine Antique Digest ("MAD").  (Id. ¶ 15.[4])  She authored an article, "Pook's First Toy Auction," for the December 2013 MAD issue ("the Article").  (Id. ¶ 129.)  The first sentence read in part that P&P "will sell any

---

[4] Also named as defendants are MAD, S. Clayton Pennington, editor of MAD, and Kate Pennington, managing editor of MAD (collectively with Solis-Cohen, the "MAD Defendants"). (Id. ¶¶ 13-14.)  The AC contains no substantive allegations concerning the Penningtons.

collection that comes along."  (Id. ¶ 130.)  She went on to write, relying on information

allegedly from Lowe, that:

> Everyone in the toy world seemed to know the major
> cosignor [sic, in AC] was Carter Reese, a longtime
> collector who bought toys that he loved before collectors
> got hung up on condition.  It didn't matter to him if the
> toy had replaced figures, was repainted, or if much of the
> paint was missing.  If the toy had charm and was cheap,
> he bought it.

(Id. ¶ 131.)  She stated that "'[t]he consensus was that many of the toys that Pook offered

brought all they were worth. . .' because, in the words of Jay Lowe, 'condition is king.'"

(Id. ¶ 132.)  Plaintiffs allege that these statements were published with actual malice

and/or with reckless disregard for the truth as a "puff piece" for Lowe and his newtiques.

(Id. ¶¶ 133-135.)

The AC contains eleven counts:  (1) civil conspiracy against P&P, the individual

Pook Defendants, Caffarella and Lowe; (2) violation of the Lanham Act, 15 U.S.C. §

1125 for false commercial advertising in the placement of Lowe's newtique on the cover

of the sale catalogue and the negative commentary in MAD about the quality of the

collection;[5] (3) common law unfair competition, coextensive with the Lanham Act claim;

---

[5] Plaintiffs do not specifically state which Defendants they intend to hold liable under
Count II and Count III.  I assume they intend to include P&P, the individual Pook Defendants,
and the MAD defendants.  I note that while these Counts do not mention him, Lowe has raised
an argument why the claims should be dismissed.  There is no allegation that Lowe was
responsible for the placement of his newtique on the cover of the sale catalogue; indeed the
Reeses entitle that portion of the AC "Pook's Promotion of Lowe's "Newtiques" . . . .  (AC at
page 15.)  While there is no allegation that he published the allegedly negative comment in MAD
about the quality of the Reeses' collection, he is quoted in the Article.  Accordingly, I will
address this aspect of the claim when I discuss Lowe's Motion.

(4) violation of section one and two of the Sherman Act;[6] (5) commercial disparagement/trade defamation against MAD and Lowe for which they seek *inter alia* the publication of a corrective article; (6) a claim pursuant to Restatement (Second) of Torts § 652E for false light against MAD and Lowe; (7) common law "injurious falsehood" against MAD and Lowe; (8) breach of fiduciary duty against P&P, the individual Pook Defendants and Caffarella; (9) negligence;[7] (10) breach of contract, breach of the duty of good faith and fair dealing, and "dishonesty in fact" against P&P and the individual Pook Defendants; and (11) common law unjust enrichment against P&P, the individual Pook Defendants, Caffarella and Lowe.

## IV.    P&P AND INDIVIDUAL POOK DEFENDANTS' MOTION TO DISMISS

In their Motion (ECF 26), P&P and the individual Pook Defendants argue that, as the claims contained in the AC all arise from their involvement in the auction sale of the Reeses' assets, and that their involvement arose from the Bankruptcy Court's order approving P&P's appointment to conduct the sale, Plaintiff's failure to allege that they secured the permission of the Bankruptcy Court before filing the claims strips us of subject matter jurisdiction.  I agree.

---

[6] Count IV also does not specify which defendants Plaintiffs intend to name.  They mention only that the count is based on "Pook & Pook sale preparation by Lowe/Caffarella." (Id. ¶ 198.)  I note, however, that the MAD Defendants have included an argument why the Sherman Act count should be dismissed as to them.  (See MAD Defs.' Mem. at 11-12.)  In their Response, the Reeses have not addressed that argument, and only discuss the Sherman Act claim with regard to P&P, the individual Pook Defendants, Lowe, and Caffarella.  (See Resp. at 60-63.)  Accordingly, I assume that Plaintiffs intended to assert Sherman Act liability only against P&P, the individual Pook Defendants, Lowe, and Caffarella.

[7] Count X also does not state which defendants are sought to be held liable.  It merely recited "Defendants have breached duties owed the Reeses."  (AC ¶ 228.)  I assume that Count X includes all defendants.

In In re VistaCare Grp., LLC, 678 F.3d 218 (3d Cir. 2012), the United States Court for the Third Circuit "join[ed] our sister circuits in holding that, under the doctrine established in Barton v. Barbour, [104 U.S. 126 (1881),] leave of the bankruptcy court is required before instituting" an action against a bankruptcy trustee.  Id. at 224 (citing Lawrence v. Goldberg, 573 F.3d 1265, 1269 (11th Cir. 2009) (holding that the Barton doctrine is applicable to bankruptcy trustees); In re Crown Vantage, Inc., 421 F.3d 963, 970 (9th Cir. 2005) (same); Muratore v. Darr, 375 F.3d 140, 143 (1st Cir. 2004) (same); In re Linton, 136 F.3d 544, 545-46 (7th Cir. 1998) (same); In re Lehal Realty Assocs., 101 F.3d 272, 276 (2d Cir. 1996) (same); In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993) (same); Anderson v. United States, 520 F.2d 1027, 1029 (5th Cir. 1975) (same).  The Barton doctrine has been applied to Chapter 11 proceedings as well as Chapter 7 proceedings.  See, e.g., In re Crown Vantage, Inc., 421 F.3d at 970 (adopting Barton doctrine in Chapter 11 debtor-in-possession case).  It applies to bar suits against bankruptcy fiduciaries even after the bankruptcy proceedings have closed.  See Muratore v. Darr, 375 F.3d 140, 147 (1st Cir. 2004) (stating that "the doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands) citing In re Linton, 136 F.3d at 544-45 (applying Barton to closed bankruptcy case).  Finally, the doctrine shields not only the bankruptcy trustee, but also "other bankruptcy-court-appointed officer[s], for acts done in the actor's official capacity."  Carter v. Rodgers, 220 F.3d 1249, 1252 (11th Cir. 2000) (applying doctrine to bar suit against bankruptcy trustee and antiques dealer appointed by the bankruptcy trustee to conduct sale of estate property).

The Reeses respond that the <u>Barton</u> doctrine does not apply because they "are operating under a confirmed plan and all of the assets have been returned to Carter to do with as he likes. <u>Barton</u> [is] simply inapplicable as there is zero impact on the confirmed plan and none of the Reeses' claims involve, in anyway [sic], any property under the Bankruptcy Court's jurisdiction." (ECF 26 at 18.) They also argue that <u>Barton</u> cannot apply because the Bankruptcy Court lacks jurisdiction to hear the claims against P&P and the Pook Defendants. While conceding that "it is true that the subject sale occurred during and as a result of the bankruptcy . . . all of the Reeses' claims exist post-confirmation outside of the Bankruptcy Code." (<u>Id.</u> at 18-19.)

The Reeses' arguments that the doctrine does not apply because their claims are outside the bankruptcy code, because their bankruptcy has ended, and because the bankruptcy court would have no jurisdiction to hear the claims are meritless. In <u>Carter</u>, the United States Court of Appeals for the Eleventh Circuit rejected these very assertions. In <u>Carter</u>, the court-appointed bankruptcy trustee and his wife attended the auction of the estate property and the wife successfully bid on one lot. Carter filed suit against the trustee and the antiques dealer that conducted the auction for breach of fiduciary duty and negligence. In affirming the district court's dismissal for lack of subject matter jurisdiction under the <u>Barton</u> doctrine, the Court held that there was no merit to

> Carter's assertion that his tort claims — breach of fiduciary duty and reasonable care — are "unrelated to" and "outside the scope" of the bankruptcy proceeding because they do not arise directly from substantive provisions of the Bankruptcy Code. **Carter posits the theory that because his claims are unrelated to the bankruptcy proceeding, the bankruptcy court lacks**

9

**jurisdiction over his lawsuit and, therefore, he was not required to obtain leave of the bankruptcy court before bringing his suit in district court.  We disagree.** The bankruptcy court has jurisdiction over Carter's claims because his breach of fiduciary duty and reasonable care claims are "related to" and "within the scope" of the bankruptcy proceeding. . . .  A proceeding is within the bankruptcy jurisdiction, defined by 28 U.S.C. § 1334(b), if it "arises under" the Bankruptcy Code or "arises in" or is "related to" a case under the Code.[8]  "'Arising under' proceedings are matters invoking a substantive right created by the Bankruptcy Code.  The 'arising in a case under' category is generally thought to involve administrative-type matters, or as the ... court put it, 'matters that could arise only in bankruptcy.'"  <u>In re Toledo</u>, 170 F.3d 1340, 1345 (11th Cir. 1999) (citations omitted).[9]  We have stated, "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy."  <u>Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)</u>, 910 F.2d 784, 788 (11th Cir. 1990).  **While Carter's action against Defendants arose after the date of the bankruptcy petition, his suit turns solely on allegations of wrongdoing in the sale of property belonging to the bankruptcy estate.**  Any recovery would reduce the administrative expenses of the sale of the estate property and would perforce increase the amount of estate property available to satisfy creditors' claims. . . .  Thus, the outcome of this case will impact Carter's bankruptcy estate.  Further, Carter sued the

---

[8] The Third Circuit has also recognized that bankruptcy jurisdiction under 28 U.S.C. § 157(a) extends to cases "arising under," "arising in," and "related to" bankruptcy jurisdiction.  <u>In re W.R. Grace & Co.</u>, 591 F.3d 164, 171 (3d Cir. 2009).  "Arising under" and "arising in" claims are "core" bankruptcy claims; claims "related to" a bankruptcy case are not.  <u>Stoe v. Flaherty</u>, 436 F.3d 209, 219 (3d Cir. 2006).

[9] The Third Circuit has similarly held that claims that "arise in" bankruptcy include those "that by their nature, not their particular factual circumstances, could only arise in the context of a bankruptcy case."  <u>Stoe</u>, 436 F.3d at 218 (citing <u>Halper v. Halper</u>, 164 F.3d 830, 836 (3d Cir. 1999) (stating that a proceeding is "core" "if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case") (quotation omitted) (emphasis added); 1 Collier on Bankruptcy § 3.01[4][c][iv] at 3–31).

> trustee and other court approved officers of his bankruptcy estate for alleged breaches of their bankruptcy-related duties.  The Bankruptcy Code establishes the office of trustee and defines the trustees' duties.  Moreover**, an action against a bankruptcy trustee for breach of bankruptcy-related fiduciary duty can only arise in a bankruptcy case.  Thus, Carter's "fiduciary claims against [the fiduciaries] are within the bankruptcy jurisdiction defined by 28 U.S.C. § 1334(b) both as 'arising under' the Code and 'arising in' a bankruptcy case."**

Carter, 220 F.3d at 1253-54 (internal citations omitted, emphasis added).  The Reeses, notably, have failed to address the holding of Carter.

I find, applying the holding of Carter, that the claims against P&P and the individual Pook Defendants fall within the "arising in a case under" category of bankruptcy jurisdiction.  The claims against these Defendants assert civil conspiracy, violation of the Lanham Act, unfair competition, violation of the Sherman Act, breach of fiduciary duty, negligence, breach of contract, dishonesty in fact, and unjust enrichment.  All of them arise from these Defendants' involvement in the auction of the Reeses' toy collection, as ordered by the Bankruptcy Court.  Like in Carter, the claims arise out of the disposition of property of an estate, as opposed to non-estate property of the bankruptcy petitioners.  If the auction was tainted, it was the bankruptcy estate that suffered since the auction proceeds that were allegedly diminished by the Defendants' actions were the property of the estate to be used to pay creditors.  I also find that the claims, which concern how the estate was administered, qualify as both "arising under" the Code and "arising in" a bankruptcy case under 28 U.S.C. § 1334(b).

Because they are core claims, the <u>Barton</u> doctrine applies to them and leave of the bankruptcy court was required before instituting them.  Because there is no assertion that the Reeses complied with that requirement, the claims against P&P and the individual Pook Defendants are subject to dismissal in their entirety.

## V.   MAD DEFENDANTS' MOTION TO DISMISS

In their Motion (ECF 25), the MAD Defendants argue all claims contained in the AC should be dismissed.  I will discuss each claim in order.

a.   Count II — Lanham Act

Count II is premised upon Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  Liability arises if a commercial message, statement, or advertisement is "either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers."  <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.</u>, 290 F.3d 578, 586 (3d Cir. 2002) citing <u>Castrol Inc. v. Pennzoil Co.</u>, 987 F.2d 939, 943 (3d Cir. 1993) ("a plaintiff must prove either literal

falsity or consumer confusion, but not both") (emphasis deleted).  The elements of a

Lanham Act claim for false advertising, or false or misleading representation of a

product, are:  "(1) that the defendant has made false or misleading statements as to his

own product [or another's]; (2) that there is actual deception or at least a tendency to

deceive a substantial portion of the intended audience; (3) that the deception is material in

that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in

interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of

declining sales, loss of good will, etc."  Warner-Lambert Co. v. Breathasure, Inc., 204

F.3d 87, 91-92 (3d Cir. 2000) (alteration in original) (quoting Johnson & Johnson-Merck

Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc., 19 F.3d 125, 129 (3d Cir.

1994)); Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir.

2011)).

        Commercial "advertising or promotion" for purposes of Lanham Act § 43(a)(1)(B)

"consists of (1) commercial speech; (2) by a defendant in commercial competition with

the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that

is sufficiently disseminated to the relevant purchasing public to constitute advertising or

promotion within the industry."  Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570,

576-77 (E.D. Pa. 1999) aff'd sub nom. Synygy, Inc. v. Scott-Levin, 229 F.3d 1139 (3d

Cir. 2000); Premier Comp Solutions., LLC v. Penn Nat. Ins. Co., Civ. A. No. 07-1764,

2012 WL 1038818, at *7 (W.D. Pa. Mar. 28, 2012) (same); 5 McCarthy on Trademarks

and Unfair Competition § 27:71 (4th ed.) (same).  The word "commercial" "excludes use

of § 43(a) to challenge the falsity of "consumer or editorial content, parodies, satires, or

13

other constitutionally protected material."  5 McCarthy on Trademarks and Unfair

Competition § 27:71 (4th ed.).  Thus, "any message that does not qualify as commercial

speech cannot be the subject of a § 43(a) false advertising or product disparagement

challenge."  Id.

The MAD Defendants first argue that Count II fails to allege a plausible violation

of Section 43(a) because the Article does not meet any of the first three elements of the

test for commercial advertising or promotion.  Specifically, they argue first that the

Reeses have failed to allege that the Article — a piece of journalism — constitutes

"commercial advertising or promotion" since it does not describe a specific product or

service, but rather an event, the Pook auction, that had already occurred.  They note that

the Reeses have failed to allege any motivation on their part for publishing the Article

other than to provide information and opinion of interest to readers about that event.

Second, they argue that the Reeses have failed to allege that they are in commercial

competition with Plaintiffs in the antique toy trade.  Rather, the AC alleges that the MAD

Defendants produce a trade journal.  (AC ¶¶ 119-120.)  Third, they argue that there is no

allegation that the Article influenced customers to buy any products sold by the MAD

Defendants, since they are not sellers of antique toys.

The Reeses respond by asserting that direct competition between themselves and

the MAD Defendants is not relevant because the Lanham Act is "'very broadly worded

and applies to 'any person' who uses virtually any means to deceive the public regarding

. . . commercial activities. . . .'"  (ECF 31 at 27 (quoting Electronic Lab. Supply. Co., Inc.

v. Cullen, 977 F.2d 798, 807 (3d Cir. 1992)).)  They contend  that the Third Circuit has

held that, "by denoting the broad scope of Section 43(a) — 'any person,' the 3rd Circuit conclusively held that a non-competitor has the right to sue for harm caused by the false representation of services in commerce." (<u>Id.</u> (citing <u>Serbin v. Ziebart Intern. Corp., Inc.</u>, 11 F.3d 1163, 1175-77 (3d Cir. 1993)).)  I find that these citations are inapposite.  In <u>Cullen</u>, the issue was whether one could be liable for another person's violation of Lanham Act § 34's prohibition on the use of counterfeit marks on an aiding and abetting theory (answered in the negative).  <u>Id.</u> at 798.  In <u>Serbin</u>, the issue was whether "**consumers** of goods or services in interstate commerce who allege that, to their detriment, they purchased such goods or services in reliance on the advertising claims of the vendor, have a federal cause of action under subsection 1 of Section 43(a). . . ." <u>Id.</u> at 1164 (emphasis added); 1177 (holding that "consumers fall outside the range of 'reasonable interests' contemplated as protected by the false advertising prong of Section 43(a)").  Neither decision stands for the proposition that a claim under Lanham Act § 43(a)'s prohibition against false commercial advertising or promotion may be maintained in the absence of competition between the parties.

The sole allegation in Count II, insofar as it relates to the MAD Defendants, is that the Article was "widely disseminated to the antique world." (AC ¶ 172.[10])  It must be remembered, of course, that the Article was published **after** the sale occurred, and was a

---

[10] The balance of Count II concerns only P&P, the individual Pook Defendants, Lowe, and Caffarella.  The only other time the MAD Defendants are mention is the assertion that the placement of the newtiques on the cover of the sale catalogue "carried through antique malls and the nation's leading antique journal — the Maine Antique's Digest, both falsely represented, disparaged the Reeses' collection while inflating the value of Lowe's fake newtiques."  (AC ¶ 170.)

report of the sale itself.  It is implausible, therefore, that any alleged falsity in the Article — even if it could be considered "commercial advertising or promotion"— could have damaged Plaintiffs by impacting the value of the collection sold at the auction.[11]  As they allege no commercial competition with Plaintiffs in the antique toy trade, and no direct injury arising from the publication of the Article against which the Lanham Act was designed to protect, Count II is subject to dismissal as to the MAD Defendants.

      b.      Count III — State Law Unfair Competition

"Under Pennsylvania law, the elements necessary to prove unfair competition through false advertising parallel those elements needed to show a Lanham Act violation, absent the requirement for goods to travel in interstate commerce."  Leonetti's Frozen Foods, Inc. v. Am. Kitchen Delights, Inc., Civ. A. No. 11-6736, 2012 WL 1138590, at *11 (E.D. Pa. Apr. 4, 2012) (quoting KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., 826 F. Supp. 2d 782, 807 (E.D. Pa. 2011)); see also Louis Vuitton Malletier & Oakley, Inc. v. Veit, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002) (same).  Because the Lanham Act allegations in Count II fail to allege a plausible claim under federal law for a false advertising injury against the MAD Defendants, I find that the common law claim also fails.  I note, additionally, that Count III does not even mention the MAD Defendants or the Article.

---

[11] I discuss at length — and reject — whether the Article can constitute "commercial advertising or promotion" below in the consideration of Defendant Lowe's Motion.

c.      Counts V and VII — Commercial Disparagement and Injurious Falsehood

Counts V and VII allege the same injury under two legal theories containing the

same elements, commercial disparagement and injurious falsehood arising from the

publication of the Article.[12]  It is undisputed by the parties that the elements of these two

_____

[12] The Article is referenced and quoted in the AC but not attached thereto.  I consider it as part of the pleadings in deciding the pending Motions to dismiss.  W. Penn Allegheny Health Sys., 627 F.3d at 97 n. 6.  It stated in pertinent part:

> As with many regional auction houses, Pook & Pook in Downington, Pennsylvania, will sell any collection that comes along. . . .   When a local collector wanted to downsize his huge toy collection, Pook & Pook agreed to try its first toy sale.

> . . .

> Everyone in the toy world seemed to know the major consignor was Carter Reese, longtime collector who bought toys that he loved before collectors got hung up on condition.  It didn't matter to him if the toy had replaced figures, was repainted, or if much of the paint was missing.  If the toy had charm and was cheap, he bought it.

> "The sale was a good test of the middle market," said dealer Jay Lowe of Lancaster, Pennsylvania, who came to the sale and did some buying.  The market has changed; condition makes a big difference.  It used to be if a toy was an 8.5 or a 9, it could bring top dollar.  Now it has to be 9.5 to 9.9 perfect, and if it isn't, it is not easy to sell, and the price differences are enormous."

> Lowe explained that's because in the 1970's and 1980's toys were rare, and fewer than 5% of the collectors wanted toys that were perfect.  Now some toys that were rare are not rare anymore, and 60% of the toy collectors want toys to be 98% perfect.

> "It's the same thing with coins," Lowe went on.  "One coin might sell for $1500, and one a little better goes for $3000, and one still better, $10,000.  And it is the same with furniture.  A chest with a rich old surface will bring one price, and one of the same forms that has been refinished [will bring] sixty to seventy percent less.  The pendulum has swung.  Huge prices are paid for condition."

> Lowe remembered a time when he could buy a toy for $800 that was missing a figure and needing a little repair and give it to a fellow to fix it and sell it for $1500 and have made a nice profit.  Not anymore.  "Now I buy a toy for

torts are:  (1) a false statement; (2) that the publisher either intends to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows the published statement is false or acts in reckless disregard of its truth or falsity.[13]  See Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 246 (Pa. 2002) (elements of commercial disparagement); McNulty v. Citadel Broad. Co., 58 Fed. App'x 556, 566 (3d

---

$800, and it costs me $400 to fix it, and I hope to sell it for $1500.  Condition is king," he said.

. . .

The consensus was that may of the toys that Pook offered brought all they were worth, and there were a lot of bargains for dealers who knew what they were buying.

. . .

Condition drives all markets because collectors with deep pockets see perfect toys as investments.  There was very little for them at this middle-market sale.

. . .

Some thought Pook should have employed a toy expert who would have included condition reports in the lot descriptions as many specialty toy auctioneers do, but others said the fact that this toy sale was not at a specialized toy auctioneer brought out the trade, who thought they would have a chance to make a discovery or two.

(ECF 25-2.)

[13]  Count VII, alleging injurious falsehood, also references Section 623A of the Restatement (Second) of Torts.  This section also has an actual malice element since it too requires that the defendant "knows that the statement is false or acts in reckless disregard of its truth or falsity."  (Id.)  Finally, Count VII also references Restatement Section 626, "Disparagement of Quality," which specifically incorporates the "rules of liability . . . stated in § 623A."  Restatement (Second) of Torts § 626.  Accordingly, I find that every iteration of the injurious falsehood tort pled in Count VII contains an actual malice element.

Cir. 2003) (elements of common law injurious falsehood).  The MAD Defendants argue

that the Reeses have failed to allege a plausible claim under either iteration of the tort

because they have not pled actual malice or any actual pecuniary loss arising from the

publication of the Article.  I agree.

While acknowledging in the AC that the elements of both torts require them to

plead and prove actual malice, i.e., knowledge on the part of the publisher that the Article

was false or that the MAD Defendants acted in reckless disregard of its truth or falsity[14]

(see AC ¶¶ 134, 204, 214), the Reeses spend many pages of their Response asserting that

they are not "public figures," and thus have no requirement to plead actual malice.  (See

Resp. at 37-42.[15])  This argument is entirely inapposite; the two torts clearly require that a

plaintiff plausibly plead the actual malice element, irrespective of whether they are public

figures.

The only attempt the Reeses make to satisfy the pleading requirement is in

paragraph 134 of the AC where they state:  "The article and its [sic] was published with

actual malice and/or a reckless disregard for the truth."  (AC ¶ 134.)  The also assert that

its publication "violated . . . industry obligations and responsibilities," and it "evidences

little to no editorial integrity — opting instead to be a puff piece for Lowe and his

newtiques."  (AC ¶¶ 133, 135.)  I find that these allegations do not satisfy the

Twombly/Iqbal standard.  First, merely alleging actual malice is insufficient; courts are

---

[14] See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) (defining the actual malice standard).

[15] They also spend many pages asserting that they have suffered defamation, a claim they have not pled in the AC.  (See Resp. at 49-53.)

not bound to accept as true legal conclusions couched as factual allegations.  <u>Twombly</u>, 550 U.S. at 555, 564.  Second, the allegations concerning journalistic standards and editorial integrity are likewise insufficient to put the MAD Defendants on notice of the basis for the claim of actual malice and that the claim is plausible, absent any specific examples of falsities in the Article that violated those standards.  Third, the reference to the Article being a "puff piece" for Lowe's newtiques is implausible to demonstrate actual malice as a matter of law since the Article never mentions newtiques.

Turning to the content of the Article, I conclude as a matter of law that the Reeses cannot plausibly claim disparagement and actual malice.  If anything, the Article was critical only of P&P — noting its lack of experience in conducting toy auctions, its failure to engage a toy expert to write condition reports, and that its inclusion of too many lots in the auction may have resulted in "quite a few rarities sold under the money."  The only references to the Reeses were that Carter bought toys "that he loved" rather than for their condition (i.e., investment potential) and that "if the toy had charm and was cheap he bought it."  The only reference to the quality of their collection is the quote from Lowe describing the sale as a "good test of the middle market" (as opposed, one would assume, to the high end of the collectible toy market).  Nothing in the AC suggests that the MAD Defendants were in possession of knowledge that would place a reasonable publisher on notice that these statements were false or that they acted with reckless disregard for whether they were true or false.  Accordingly, Counts V and VII are dismissed as to the MAD Defendants.

d.      Counts VI — False Light

A claim for false light is governed by the Restatement (Second) of Torts § 652E, which provides:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977); Krajewski v. Gusoff, 53 A.3d 793, 805-806 (Pa. Super. Ct. 2012), *appeal granted*, 74 A.3d 119 (Pa. 2013), *appeal dismissed*, 84 A.3d 1057 (Pa. 2014). For the information about a person to be "highly offensive," it must constitute a "major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position . . . ." Id. cmt. c.

Because the false light tort also has as an element the actual malice standard required by commercial disparagement and injurious falsehood, I find that this claim too has not been plausibly pled. Alternatively, I find the claim is also implausible as a matter of law since the content of the Article would not be taken by reasonable persons in the Reeses' position to be highly offensive. As illustrations of material that would be highly offensive, the comment to the Restatement offers: the police improperly including one's photograph in a "rogues gallery" of criminals when one was mistakenly arrested and

never convicted of a crime; and the use of a picture of a child who has been injured

through no fault of his own to illustrate an article captioned "They Ask to Be Killed."

Referring to the Reeses' toy collection as "middle market" does not rise to the same level

of offensiveness, and does not cast a similar level of adverse reflection on their character

or reputation.  Thus, this claim against the MAD Defendants is also dismissed as

implausible.

       e.       Counts IX — Negligence

       Finally, the MAD Defendants argue that the negligence claim is subject to

dismissal.  In Count IX, the Reeses allege only that "[a]s demonstrated above, in the best

light, Defendants have breached duties owed the Reeses and, as a result, the Reeses have

been injured, suffering actual damages."  (AC ¶ 228.)  Defendants contend that since the

commercial disparagement and false light claims require a degree of fault greater than

negligence under Pennsylvania law, the Reeses "must allege a degree of fault . . . that is

greater than negligence."  (ECF 25 at 23.)  In their Response, the Reeses fail to address

the negligence claim argument in any manner.

       I find that this claim is subject to dismissal.  Plaintiffs do not identify any specific

duty the MAD Defendants breached, other than the duty not to engage in commercial

disparagement or paint them in a false light.  Under Pennsylvania law, "[t]o establish a

common law cause of action in negligence, 'the plaintiff must demonstrate that the

defendant owed a duty of care to the plaintiff, the defendant breached that duty, the

breach resulted in injury to the plaintiff and the plaintiff suffered an actual loss or

damage.'"  <u>Brisbine v. Outside In School of Experiential Educ., Inc.</u>, 799 A.2d 89, 93

(Pa. Super. Ct. 2002) (quoting <u>Brezenski v. World Truck Transfer, Inc.</u>, 755 A.2d 36, 40

(Pa. Super. Ct. 2000)).  "All negligence claims are premised on the alleged violation of a

duty."  <u>Peek v. Philadelphia Coca-Cola Bottling Co.</u>, Civ. A. No. 97-3372, 1997 WL

399379, at *5 (E.D. Pa. July 10, 1997) (citing <u>Wenrick v. Schloemann–Siemag

Aktiengesellschaft</u>, 564 A.2d 1244, 1248 (Pa. 1989).  A duty is

> that responsibility which exists by operation of law
> requiring a person to adhere to a standard of conduct
> protecting others against unreasonable or unnecessary
> risks.  In the absence of legal duty, no liability will attach,
> even if a defendant's conduct was negligent.  In this sense,
> the concept of legal duty is both a source of legal
> responsibility, and a limitation upon liability to others:
> recognition of a legal duty by the courts will impose
> certain obligations, while refusal to recognize a legal duty
> by the courts will insulate a party against liability.  The
> duty owed by a defendant may be express or implied, may
> be general or arise from specific circumstances.   In
> determining the existence of a duty, the courts will look to
> a variety of sources, including the common law, statutes,
> or a contract between the parties.  Ultimately, however, it
> is the court's decision whether to recognize a duty that is
> fundamental to the existence of a negligence claim.

3 West's Pa. Prac., Torts: Law and Advocacy § 1.2 (footnotes omitted).

Whatever duty the MAD Defendants owed to the Reeses to refrain from

publishing information that would constitute commercial disparagement or paint them in

a false light is necessarily coterminous with the duty owed to refrain from committing the

underlying torts.  My findings that they have failed to allege plausible claims for those

torts foreclose their ability to proceed on a negligence theory since these are the sources

for any purported duty.  More importantly, since this is a situation where liability for

negligence is premised upon the exercise of the MAD Defendants' First Amendment

right to publish their magazine, the same rationale that led the United States Supreme Court in <u>Sullivan</u> to impose the actual malice standard, rather than the common law negligence standard, applies here since all of the underlying torts incorporate the heightened standard in recognition that free speech rights are involved.

Accordingly, I grant the MAD Defendants' Motion to Dismiss in its entirety.

## VI.   LOWE'S AND CAFFARELLA'S MOTIONS TO DISMISS

In his Motion (ECF 27), Lowe argues that all claims contained in the AC in which he is named as a defendant are subject to dismissal.  In his Motion (ECF 30), Caffarella joins many of Lowe's arguments.  I will discuss the two motion jointly; I will discuss each claim in order.

a.   Count I — Conspiracy

The parties do not dispute that a claim of civil conspiracy in Pennsylvania contains the following elements:  (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.  <u>Goldstein v. Phillip Morris, Inc.</u>, 854 A.2d 585, 590 (Pa. Super. Ct. 2004).  An '"actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor."'  <u>Levin v. Upper Makefield Twp.</u>, 90 F. App'x 653, 667 (3d Cir. 2004) (quoting <u>In re Orthopedic Bone Screw Prods. Liab. Litig.</u>, 193 F.3d 781, 789 (3d Cir. 1999)).  Ultimately, "only a finding that the underlying tort has occurred will support a claim for civil conspiracy."  <u>Alpart v. Gen. Land Partners, Inc.</u>, 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008) (quotation omitted); <u>see also Duffy v.</u>

Lawyers Title Ins. Co., 972 F. Supp. 2d 683, 698 (E.D. Pa. 2013) ("Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act."). To allege a plausible claim of civil conspiracy, a plaintiff must make "factual allegations of combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events." Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997) (citation and internal quotation marks omitted). It is not enough that the "end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." Id.

Lowe argues that the Reeses' attempt to state a claim for civil conspiracy fails because: (1) they do not identify the Defendants' alleged common purpose or the particular unlawful act that the Defendants were pursuing; rather Count I consists merely of recitations of Pennsylvania case law along with the conclusory statement that Defendants engaged in a conspiracy; and (2) Lowe, as well as Caffarella, were acting as P&P's consultants, were conducting the business of P&P, and "formed an indispensable part of the company. Consequently, they cannot have conspired with the company. . . ." (ECF 27 at 13.) Caffarella makes similar arguments. I find that the AC contains enough factual matter, accepted as true, to create a plausible claim of civil conspiracy against these two Defendants. I also find that the intracorporate conspiracy doctrine does not bar the claim based on the allegations presented.

The substantive portion of Count I states, in its entirety, that "Pook[16] as principal, Caffarella as Pook's agent, and Lowe combined or agreed with intent to do an unlawful act, or to do an otherwise lawful act by unlawful means in the manner described above." (AC ¶ 163.)  In other parts of the AC, the Reeses assert that Lowe and Caffarella improperly set up the display at the auction to permit their own below-value purchases of toys.  They allegedly mixed unmatched parts of multi-part toys in different lots, reducing the likelihood that other bidders, particularly phone and internet bidders, would perceive the true value of the lots.  They are alleged to have bid on lots using that inside information, in order to later rematch the parts and create toys of greater value that they could then sell at their own retail stand.  (AC ¶¶ 56-75.)  These allegations are sufficient, if proven, to show concerted action between them, their common purpose, and an intent to injure.  See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979) (citing Miller v. Post Publ'g Co., 110 A. 265 (Pa. 1920) ("Proof of malice i.e., an intent to injure, is essential in proof of a conspiracy.")

At this stage of the proceedings, I must also reject Lowe's argument that he could not as a matter of law have conspired with P&P or Caffarella.[17]  While Lowe is correct that, for purposes of a civil conspiracy claim, a corporation cannot conspire with itself through the activities of its own employees, officers, and directors, see Jagielski v. Pkg.

---

[16] Count I of the AC does not state clearly to whom "Pook" refers.  AC ¶ 16 states that Ron and Debra Pook would be referred to collectively as the "Pooks."  AC ¶ 17 states that Pook & Pook, Inc. would be referred to as "Pook & Pook."  The individual Pook family members are referred to individually by their first names.  (See AC ¶¶ 20-22.)  I assume that the use of "Pook" in Count I refers to P&P and not the individual Pook Defendants.

[17] Caffarella has not joined this argument.

Mach. Co., 489 F. Supp. 232, 233 (E.D. Pa. 1980) (stating that under Pennsylvania law, officers and employees of a corporation "cannot conspire with the corporation of which they form an indispensable part"), the Reeses have not averred that Lowe or Caffarella were P&P employees.  They allege Lowe was involved "in multiple facets of the antique industry," an "expert, dealer, and purchaser," the owner of his own antique business, Caffarella's partner in a consulting business, and had worked with Caffarella as an independent contractor for another auction house.  (AC ¶¶ 27, 31, 33, 85.)  James Pook allegedly told Carter Reese that P&P "was going to use a pair of 'toy experts' to assist him" in the Reese auction, and that Carter confirmed that "Caffarella and, thus, Lowe," were to be those experts.  (AC ¶¶ 53-54.)  There is no allegation that Lowe or Caffarella were P&P employees, and none of these alleged roles bring them within the intracorporate conspiracy doctrine.

At best, Lowe can be deemed an agent of P&P acting in his individual capacity. Judge Pratter recently had occasion to review the scope of the intracorporate conspiracy doctrine in Cannon v. City & Cty. of Philadelphia, Civ A. No. 14-5388, 2014 WL 7399037 (E.D. Pa. Dec. 30, 2014).  She stated:

> Federal courts in the Third Circuit have explained that agents acting in their individual capacities rather than their official capacities can be liable for civil conspiracy.  See, e.g., Heffernan v. Hunter, 189 F.3d 405, 412-13 (3d Cir. 1999) ("[C]ourts that have followed the [intracorporate conspiracy] doctrine allow an exception when the employees have acted for their sole personal benefit and thus outside the course and scope of their employment. That exception is based on the proposition that since the employer would not be subject to liability under respondeat superior, it would not be a conspirator.");

General Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 397, 313 (3d Cir. 2003); Robison v. Canterbury Village, Inc., 848 F.2d 424, 431 (3d Cir. 1988) (noting that a conspiracy may exist between a corporation and an officer "if the officer is acting in a personal, as opposed to official, capacity"); Lee v. SEPTA, 418 F. Supp. 2d 675, 681 (E.D. Pa. 2005) ("An employer and its officers and employees acting in the scope of their duties constitute one legal person for purposes of conspiracy law and therefore cannot conspire together." (emphasis added)).   However, "at least one panel of the Pennsylvania Superior Court, in a nonprecedential decision, has opined that no such 'exception' to the intracorporate conspiracy doctrine 'is recognized by Pennsylvania state courts.'"   Accurso [v. Infra-Red Servs., Inc.], 23 F. Supp. 3d [494] at 515 [E.D. Pa. 2014] (quoting Lilly v. Boots & Saddle Riding Club, No. 57 C.D.2009, 2009 WL 9101459, at *6 (Pa. Commw. Ct. July 17, 2009)).   Consequently, it is not clear whether such an exception to the intracorporate conspiracy doctrine exists in Pennsylvania law.

. . .

Pennsylvania courts have often applied the intracorporate conspiracy doctrine without elaborating on its reasoning or its relationship to the scope of employment, but they ordinarily apply the doctrine when defendants allegedly conspired with other agents or the principal corporation on behalf of the principal corporation.   See, e.g., Lackner [v. Glosser,] 892 A.2d [21] at 26 [(Pa. Super. Ct. 2006)] (alleging a conspiracy to engage in improper accounting practices to deprive plaintiff of promised bonuses); Rutherfoord v. Presbyterian-University [Hosp.], 417 Pa. Super. 316, 612 A.2d 500, 502 (Pa. Super. Ct.1992) (alleging a conspiracy to terminate plaintiff's employment with defendant company); Weiner v. Markel Int'l Ins. Co., No. 2005-1045, 2006 WL 1142484 (Pa. Ct. Comm. Pl. Apr. 25, 2006) (alleging a conspiracy to refuse to pay benefits); Rick's Original Philly Steaks, Inc. v. Reading Terminal Market Corp., No. 2008-3822, 2008 WL 1780822 (Pa. Ct. Comm. Pl. Feb. 20, 2008) (alleging conspiracy between landlord and agent to refuse to renew lease).

28

Cannon, 2014 WL 7399037, at *8-9.  Judge Pratter went on to find persuasive the "reasoning of the federal courts in Pennsylvania that have adopted a limited scope-of-employment exception to the intracorporate conspiracy doctrine," stating that "[i]t cannot be the case that co-agents can never be liable for civil conspiracy — even if the alleged conspiracy was outside the scope of their employment — merely because they happen to be co-workers.  There must be some connection between the alleged conspirators' status as co-agents and the alleged tort for the doctrine to preclude a finding of liability."  Id. at *10.

Applying this rationale, I find that the Reeses' civil conspiracy claim against Lowe is not defeated by the alleged fact that Lowe assisted James Pook in setting up the auction.  There is no assertion in the AC that Lowe was employed by P&P, was engaged by P&P as a consultant, or was conducting the business of P&P.  What the Reeses have pled is that Lowe owned his own independent antique business.  Significantly, Lowe is alleged to have undertaken his attempt to subvert the value of the auction lots to benefit himself, not to benefit P&P (which arguably lost commission revenue on the auction as a result of the depressed prices).  There is, according, no basis to apply the intracorporate conspiracy doctrine at this point in the proceedings to dismiss the civil conspiracy claim against Lowe.

b.      Count II — Lanham Act

Lowe argues that Count II[18] fails as a matter of law to state a claim under Section

43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) insofar as it concerns the

Article in which he was quoted.  He argues that the Article merely recounted the events

of the auction after it occurred, and cannot, accordingly, constitute "commercial

advertising or promotion."  He also argues that he is not in commercial competition with

the Reeses.  Caffarella argues that the claim fails because there are no allegations

whatsoever that he engaged in any kind of commercial speech.  I find that Lowe is

correct when he asserts that the Article does not qualify as "commercial advertising or

promotion."  Caffarella is also correct that there is a complete failure to allege he engaged

in commercial speech.

As noted above, Lowe is quoted in the Article as stating, that,

> "The sale was a good test of the middle market," said
> dealer Jay Lowe of Lancaster, Pennsylvania, who came to
> the sale and did some buying.  The market has changed;
> condition makes a big difference.  It used to be if a toy
> was an 8.5 or a 9, it could bring top dollar.  Now it has to
> be 9.5 to 9.9 perfect, and if it isn't, it is not easy to sell,
> and the price differences are enormous."

(ECF 25-2.)  He opined that, while in the past few collectors desired perfect toys, as with

collectors of other antiques, the majority of the toy collectors now desire perfect

examples and "[c]ondition is king."  (Id.)  Taken in the light most favorable to the

---

[18] As I previously noted, although Count II does not mention him, Lowe has raised an argument why the claim should be dismissed.  There is no allegation that Lowe was responsible for the placement of his newtique on the cover of the sale catalogue.  Accordingly, I limit the discussion of liability to the allegedly negative comment in the Article about the quality of the Reeses' collection sold at the auction, based upon Lowe's quotes in the Article.

Reeses, Lowe was quoted in an Article reporting on events that had already occurred, wherein he opined that the quality of their toys were middle market and failed to bring top dollar because of their less-than-perfect condition.  He did not opine on the quality of the Reeses' remaining toy collection, or on the quality of his own inventory of toys, he did not write or publish the Article, there is no allegation he was responsible for its editorial content, and the Article contained no advertisement or promotion of Lowe's toy business.  Given this, I find that the Reeses have failed to state a plausible violation of Section 43(a).  There is simply no basis to conclude that Plaintiffs have plausibly alleged the Article constituted commercial speech, let alone Lowe's or Caffarella's commercial speech, or that it was designed to influence customers to buy Defendants' products.

> c.      Counts III, V and VII — Unfair Competition, Commercial Disparagement and Injurious Falsehood

Lowe and Caffarella argue that, to the extent that these claims reference the P&P auction that occurred on September 6-7, 2013, they are time barred because each such claim is subject to a one year statute of limitations,[19] and the Reeses did not file this action until October 7, 2014.  As the Reeses make no argument in their Response to show that this part of the claims are timely, I find they are subject to dismissal.

To the extent that the claims reference the Article, Lowe contends that his comments quoted therein did not address the Reeses personally, nor any specific item

---

[19] See 42 P.S.A. § 5523 (providing one year statute of limitation on claims of commercial disparagement, false light and injurious falsehood); Pro Golf Mfg., 809 A.2d at 245 (holding that "one-year limitations period found in Section 5523(1) governs an action for commercial disparagement"); Little v. City & Cty. of Philadelphia, Civ. A. No. 07-5361, 2008 WL 2704579, at *4 (E.D. Pa. July 3, 2008) (holding that false light claim is subject to a one-year statute of limitations of Section 5523).

consigned by the Reeses in the P&P auction, but merely constituted a general description of antique toy market at that time and how items are valued by market participants.  As such, he contends, his comments were not defamatory as a matter of law so as to support claims for unfair competition, commercial disparagement or injurious falsehood. Caffarella argues that the claims fails because he is not alleged to have engaged in any disparaging speech.  I agree.

For reasons similar to those discussed above with regard to the MAD Defendants, I find that all of these claims are implausible because they do not rise to the level of actual malice.  First, Lowe did not write the Article; thus, he can only be responsible for his own statements — which I assume are accurately quoted — and not the Article's editorial content and opinions.  Most significantly, this would exclude the identification of the Reeses as the consignor of the toys, a statement not attributed by the author to Lowe.  Thus, there is a clear break in the causation between Lowe and any alleged impugning of the Reeses' collection in the Article.  Second, the Reeses have failed to assert that, in making his statements, Lowe uttered something he knew was false or was stated in reckless disregard of its truth or falsity.  As noted, the allegation that the Article was a "puff piece" for Lowe's newtiques, even if it could be attributed to Lowe, is implausible to demonstrate actual malice as a matter of law since the Article never mentions newtiques.  Third, the allegedly defamatory statement central to the claim, that Carter bought toys "that he loved" rather than for their condition, is not attributed to Lowe.  Fourth, I find that the implication that the Reeses' collection was not high quality, which allegedly arises from Lowe describing the sale as a "good test of the middle

32

market," is not "highly offensive" as a matter of law so as to support a false light claim, since it is not a "major misrepresentation of [] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man." Restatement (Second) of Torts § 652E cmt. c.  As suggested above with regard to the MAD Defendants, referring to the Reeses' toy collection as "middle market" does not rise to the same level of offensiveness as the examples listed in the Restatement, and does not cast a similar level of adverse reflection on their character or reputation.  Finally, there is no allegation that Caffarella engaged in any allegedly disparaging speech.

Accordingly, Counts III, V and VII are dismissed as to Lowe and Caffarella.

d.     Count IV — Antitrust Claims

In Count IV, the Reeses allege Lowe and Caffarella, along with P&P and the Pook Defendants, violated the Sherman Act and the Clayton Act, as well as Section 2(c) of the Robinson-Patman Act.  (AC ¶¶ 188-200.)  Other than recitations of the various antitrust statutes, the only allegation contained in Count IV is that the "poor Pook & Pook sale preparation by Lowe/Caffarella was intentional, aimed at ensuring they and others could piecemeal make a killing off of the Reeses by purchasing seemingly disparate lots that, when combined, contained complete toys and 'rare finds' worth thousands of dollars more than the entire lot was purchased for."  (AC ¶ 198.)  Lowe, joined by Caffarella, argues that the Count is subject to dismissal because the Reeses have completely failed to allege antitrust injury.  I agree.

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the

several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.

Section 4 of the Clayton Act, in turn, grants the right to maintain a private cause of action

to "[a]ny person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws."  15 U.S.C. § 15(a).  As these sections imply, standing

and antitrust injury are essential elements to maintaining an action for damages

thereunder.  See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110

(1986).  Under Section 1, a plaintiff must plausibly allege the following three elements:

(1) an agreement; (2) imposing an unreasonable restraint of trade within a relevant

product market; and (3) resulting in antitrust injury."  In re Ins. Brokerage Antitrust

Litig., 618 F.3d 300, 315 (3d Cir. 2010).  Antitrust injury consists of (1) harm of the type

the antitrust laws were designed to prevent; and (2) an injury which flows from that

which makes defendants acts unlawful.  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,

429 U.S. 477, 489 (1977); Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.,

995 F.2d 425, 429 (3rd Cir. 1993).  To be an antitrust injury, the injury must "reflect the

anticompetitive effect either of the violation or of the anticompetitive acts made possible

by the violation" and represent "the type of loss that claimed violations. . . would be

likely to cause."  Brunswick Corp, 429 U.S. at 489; Race Tires of Am. Inc. v. Hoosier

Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010); City of Pittsburgh v. West Penn

Power Co., 147 F.3d 256, 266 (3d Cir. 1998).  "While a plaintiff may have individually

suffered an injury as a result of defendants' actions, the antitrust laws were designed to

protect market-wide anticompetitive activities."  Eichorn v. AT&T Corp., 248 F.3d 131,

140 (3d Cir. 2001), *amended* (June 12, 2001) (citing Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990)).

The Reeses make no attempt to tie the alleged wrongdoing of Lowe, Caffarella and P&P to any market-wide anticompetitive impact.  Notably, they don't even attempt to define the relevant product market and the relevant geographic market.  Count IV merely restates the Defendants' alleged improper conduct of the auction under the guise of an antitrust claim without any allegation of the specific antitrust law elements that create such a claim.  As such, I conclude the claim is implausible and subject to dismissal.[20]

_____

[20] Although Plaintiffs quote Section 2(c) of the Robinson-Patman Act in the AC, neither side has addressed Count IV in terms of this statute.  It provides:

> (c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or on behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).  This provision "was designed to eliminate the competitive advantage large buyers and sellers attained over their smaller competitors by virtue of their economic clout and bargaining power."  Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 991 n. 5 (4th Cir. 1990).  Section 2(c) "encompasses cases of commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent, representative, or other intermediary in a transaction involving the sale or purchase of goods."  Harris v. Duty Free Shoppers Ltd. P'ship, 940 F.2d 1272, 1274 (9th Cir. 1991) (citation omitted).  For a finding of commercial bribery, plaintiff "must show that the illegal payments in question crossed the line from buyer to seller or vice-versa."  Envtl. Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1066 (3d Cir. 1988), aff'd, 493 U.S. 400 (1990); see also Ellwood City v. Pennsylvania. Power Co., 570 F. Supp. 553, 562 (W.D. PA. 1983) (noting "intrastate sales are subject to the Robinson–Patman Act as long as the sales remain in the flow of interstate commerce").  The AC also cites and quotes 15 U.S.C. § 13a, prohibiting price discrimination.

e.     Counts VIII — Breach of Fiduciary Duty

Lowe argues that Count VIII's claim for breach of fiduciary duty — in which the Reeses claim that "the Pook Defendants — including Caffarella" had a fiduciary relationship to them, is subject to dismissal under the "gist of the action doctrine" and because it fails to state claims upon which relief may be granted.

I note, preliminarily, that Count VIII by its own terms does not name Lowe as one who would be liable.  There is no allegation that he was in a fiduciary relationship with the Reeses.  Further, in their omnibus Response, the Reeses do not raise any argument that Lowe is liable under Count VIII.  (See ECF 31 at 66-70.)  Accordingly, I the claim is dismissed to the extent that it might be construed as a claim against Lowe.

Caffarella argues the claim is implausible because any fiduciary relationship existed only between the Reeses and P&P, the entity with whom they contracted to conduct the sale.  He argues there have been no facts alleged to suggest that he owed any such duty, that he had any form of contractual relationship with them, or that they had placed any trust or confidence in him, such that a fiduciary relationship could be deemed to exist.  Indeed, he notes, Plaintiffs have alleged they told P&P they did not want Caffarella involved in the sale.  (See AC ¶¶ 54-55.)

To allege a breach of fiduciary duty, Plaintiffs must assert that a fiduciary or confidential relationship existed between themselves and Defendants.  Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414 (E.D. Pa. 2006) (citing Harold v.

---

Because there is no allegation of commercial bribery or price discrimination, I find these aspects of Count IV are also subject to dismissal.

McGann, 406 F. Supp. 2d 562, 571 (E.D. Pa. 2005). "Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." Id. (quoting Silver v. Silver, 219 A.2d 659, 662 (Pa. 1966); see also Basile v. H & R Block, Inc., 777 A.2d 95, 101-02 (Pa. Super. Ct. 2001). To allege a breach of that duty, Plaintiffs must allege (1) that the Defendants negligently or intentionally failed to act in good faith and solely for the benefit of Plaintiffs in all matters for which they were employed; (2) that Plaintiffs suffered injury; and (3) the Defendants' failure to act solely for the Plaintiffs' benefit was a real factor bringing about Plaintiffs' injuries. Id. at 414-415 (citing McDermott v. Party City Corp., 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998). I find that the Reeses have failed to allege the plausible existence of a fiduciary relationship.

In their Response, the Reeses discuss at length the terms of their agreement with P&P and how they placed their trust in P&P, in an attempt to establish that the company exercised absolute control over the auction. (ECF 31 at 66-70.) Notably absent from that discussion, however, is any mention of how that agreement, to which Caffarella was not a party, created a fiduciary duty between themselves and Caffarella. They cannot plausibly assert that they placed trust in Caffarella when they allege and argue that P&P had absolute control over the auction and that **it** violated that trust by utilizing Caffarella's services against their wishes. Accordingly, Count VIII is dismissed against both Defendants.

e.      Count IX — Negligence

Count IX's negligence claim, as noted earlier, appears to assert that all defendants are liable.  Lowe argues that it is barred by the gist of the action doctrine because the negligence allegedly arises out of duties imposed by the contract the Reeses signed with P&P.  I find this argument is meritless and the negligence claim survives.

The gist of the action doctrine applies to tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract."  Hults v. Allstate Septic Sys., L.L.P., Civ. A. No. 06-0541, 2007 WL 2253509, at *10 (M.D. Pa. Aug. 3, 2007) (citing Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005)).  The principle underlying the doctrine is that a tort action derives from "the breach of duties imposed as a matter of social policy," whereas a breach of contract action stems from "the breach of duties imposed by mutual consensus."  Redevelopment Auth. of Cambria Cnty. v. Int'l Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1996).

The obvious flaw in Lowe's gist of the action argument is that there is no allegation that there is "a contract between the parties."  Indeed, Lowe himself argues that the Reeses' breach of contract claim must be dismissed because he is not a party to any contract with them.  (See ECF 27 at 32.)  Lowe was not a signatory to the Reese/P&P contract.  There is no assertion that his liability to the Reeses stems from a contract or that the breach of duty underlying the negligence claim against him duplicates duties

owed by a contract.  None of the cases he cites involves an application of the doctrine where the parties were not bound by a contract.  See Hart, 884 A.2d at 316 (contract for sale of land); Bash v. Bell Tel. Co., 601 A.2d 825, 830 (Pa. Super. Ct. 1992) (contract for yellow pages ad); eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10 (Pa. Super. Ct. 2002) (contract to market and advertise product); The Brickman Grp., Ltd. v. CGU Ins. Co., 865 A.2d 918 (Pa. Super. Ct. 2004) (insurance contract).

The duty allegedly breached arises not from P&P's agreement to conduct the auction, but from Lowe's alleged conduct in improperly manipulating the content of the auction lots, dividing multi-part toys into separate lots to discourage interest by others bidders and thereby obtain the merchandize more cheaply for himself.  I find that the Reeses have alleged a plausible negligence claim based on these allegations.

Caffarella argues that the claim is implausible because any work he performed for the auction was done in his capacity as a contractor engaged to perform work on behalf of P&P.  Thus, he contends, he did not owe an independent duty of care to the Reeses.  He cites no authority for his implied proposition that an employee/contractor/agent can never as a matter of law be negligent where the injured party has also sued his principal.  Nor could he.

Plaintiffs in a negligence action are allowed to recover from both a principal and his agent under Pennsylvania law.  See, e.g., Milton S. Hershey Med. Ctr. of Pa. State Univ. v. Commonwealth Med. Prof'l Liab. Catastrophe Loss Fund, 821 A.2d 1205, 1212 (Pa. 2003) (providing that a plaintiff may seek relief in tort from both an agent and his principal under a theory of vicarious liability) (citing Mamalis v. Atlas Van Lines, Inc.,

39

560 A.2d 1380, 1383 (Pa. 1989)).  Under Pennsylvania law, employees are liable for their

own torts, even if they were acting within the scope of their employment when they

engaged in the tortious conduct in question.  See Pilot Air Freight Corp. v. Sandair, Inc.,

118 F. Supp. 2d 557, 564 (E.D. Pa. 2000); Cosmas v. Bloomingdales Bros., Inc., 660

A.2d 83, 88-89 (Pa. Super. Ct. 1995) (observing "[a]n agent who does an act otherwise a

tort is not relieved from liability by the fact that he acted at the command of the principal

or on account of the principal" (citation omitted)).  Pennsylvania law recognizes the

participation theory, under which a corporate officer, employee, or other agent "who

takes part in the commission of a tort by the corporation is personally liable therefor."

Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 90 (Pa. 1983) (citation omitted); see also

Sannuti v. Starwood Hotels & Resorts Worldwide, Inc., Civ. A. No. 14-587, 2014 WL

1515650, at *2 (E.D. Pa. Apr. 16, 2014).  To be liable under this theory, the corporate

agent must have "participate[d] in the wrongful acts," a requirement the Pennsylvania

courts have interpreted to permit liability for an agent's misfeasance, but not for "mere

nonfeasance."  Wicks, 470 A.2d at 90.  Misfeasance consists of "the doing of something

which ought not to be done, something which a reasonable man would not do, or doing it

in such a manner as a man of reasonable and ordinary prudence would not do it."

Sannuti, 2014 WL 1515650, at *2 (quoting Brindley v. Woodland Vill. Rest., Inc., 652

A.2d 865, 868-70 (Pa. Super. Ct. 1995)).

   That is exactly what the Reeses have alleged.  They plausibly contend that

Caffarella's misfeasance in manipulating the auction lots constituted negligence.  I find

that the fact that he is alleged to have been a consultant for P&P is irrelevant to whether

he owed the Reeses a duty of care not to act improperly.

     f.     Count X — Breach of Contract

As stated above, neither Lowe nor Caffarella are parties to any contract with the

Reeses.  They seek to dismiss Count X for that reason.  I agree.  Neither Defendant is

specifically named in Count X, they are not listed as parties to the only contract at issue,

and the Reeses do no argue that there is any contract in existence between these

Defendants and themselves.

     g.     Count XI — Unjust Enrichment

The Reeses allege that ". . . Caffarella, and Lowe jointly benefited, and continue to

benefit, from exploitation Plaintiffs [sic]. . . .  Plaintiffs have conferred upon Defendants

economic opportunity and actual economic benefit, in the nature of profits resulting from

unlawful auction practices and other conduct described above, to the economic detriment

of Plaintiffs."  (AC ¶¶ 239-240.)  They assert it would be inequitable to permit

Defendants to retain that profit, and seek an order of disgorgement.  (Id. ¶¶ 241-242.)

Lowe and Caffarella argue that the doctrine of unjust enrichment has no application to

this dispute because the Reeses did not undertake any act or intentionally confer any

benefit upon them.  (ECF 27 at 33-34; ECF 30 at unnumbered page 7.)  I find that the

Reeses have stated a plausible unjust enrichment claim against Lowe and Caffarella.

As Judge O'Neill wrote:

> a claim of unjust enrichment must allege the following
> elements: (1) plaintiff conferred a benefit on the
> defendant; (2) the defendant appreciated the benefit; and

(3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit.  Com. ex. rel. Pappert v. TAP Pharm. Prods., Inc., 885 A.2d 1127, 1137 (Pa. Commw. 2005).  See also, Torchia v. Torchia, 346 Pa. Super. 229, 499 A.2d 581, 582 (1985) noting that "to sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." (internal quotation omitted).  "The polestar of the unjust enrichment inquiry is whether the defendant has been unjustly enriched; the intent of the parties is irrelevant." Limbach v. City of Phila., 905 A.2d 567, 577 (Pa. Commw. 2006).  "In order to recover, there must be *both* (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied."  Samuels v. Hendricks, 300 Pa. Super. 11, 445 A.2d 1273, 1275 (1982) (emphasis in original), quoting Meehan v. Cheltenham Twp., 410 Pa. 446, 189 A.2d 593, 595 (1963).

Global Ground Support, LLC v. Glazer Enter., Inc., 581 F. Supp. 2d 669, 675-76 (E.D. Pa. 2008).  The Reeses have alleged both an enrichment and an injustice.  Lowe and Caffarella allegedly enriched themselves — i.e., received a benefit — by manipulating the auction lots to discourage bidding and pay artificially low prices on toys they later resold for a profit.  The AC plausibly alleges that they appreciated the benefit and that their retention of the benefit, under the circumstances, would be inequitable.

Accordingly, Count XI survives as to Lowe and Caffarella.

## VII.   CONCLUSION

In conclusion, the claims against P&P and the individual Pook Defendants are subject to dismissal in their entirety.  The MAD Defendants' Motion is also granted in its

entirety.  Lowe's Motion to dismiss is granted as to Counts II (Lanham Act), III (unfair competition), IV (antitrust claims), V (commercial disparagement), VI (false light), VII (injurious falsehood), VIII (breach of fiduciary duty), and X (breach of contract); Caffarella's Motion is granted as to these same counts, save Count VIII's claim of breach of fiduciary duty.  Thus, only Lowe and Caffarella remain as defendants.  The claims that remain against Lowe are Count I (conspiracy), IX (negligence), and XI (unjust enrichment). [21]  The claims that remain against Caffarella are Count I (conspiracy), VIII (breach of fiduciary duty), IX (negligence), and XI (unjust enrichment).

An appropriate Order follows.

---

[21] Lowe also argues that many provisions of the AC should be struck under Federal Rule of Civil Procedure 12(f) because they constitute immaterial, impertinent and scandalous material. (ECF 27 at 34.)  Rule 12(f) provides: "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "Motions to strike function 'to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'"  Mitchell v. Cmty. Educ. Ctrs., Inc., Civ. A. No. 14-5026, 2015 WL 4770652, at *11 (E.D. Pa. Aug. 11, 2015) (quoting McInerney v. Moyer Lumber & Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)).  "'The standard for striking a complaint or a portion of it is strict, and only allegations that are so unrelated to the plaintiffs' claims as to be unworthy of any consideration should be stricken.'"  Ford-Greene v. NHS, Inc., Civ. A. No. 14-5846, 2015 WL 2395409, at *21 (E.D. Pa. May 20, 2015) (quoting Steak Umm Co., LLC v. Steak 'Em Up, Inc., Civ. A. No. 09-2857, 2009 WL 3540786, at *2 (E.D. Pa. Oct. 29, 2009)).  Consequently, "[m]otions to strike are generally disfavored by courts and will be denied unless the allegations 'have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case.'"  Mitchell, 2015 WL 4770652, at *11 (quoting Natale v. Winthrop Res. Corp., Civ. A. No. 07-4686, 2008 WL 2758238, at *14 (E.D. Pa. July 9, 2008)).

Many of the provisions Lowe seeks to strike use bright purple prose to describe the Defendants' actions.  Most of it, however, I find is related to the allegations of the claims that I find can survive.  However, the Motion is due to be granted as to the following material:  (1) Heading "V. Pooling" and ¶¶ 81-82 (describing an alleged 1987 conviction suffered by Ron Pook ; and (2) Heading "VII.  The 'Second Rape' of the Reeses."  None of this material is related to the surviving claims and may cause prejudice or confusion.